**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  16-60350-cr-DIMITROULEAS (s)**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**vs.**

**JERMAYNE WHYTE,**

     **Defendant,**
**---------------------------------------/**

**<u>DEFENDANT'S RESPONSE TO THE PRESENTENCE
INVESTIGATION REPORT AND MEMORANDUM IN AID OF
SENTENCING</u>**

     The defendant, **JERMAYNE WHYTE**, by and through his undersigned

counsel, and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), (e)(2)

and (f), and the Fifth Amendment to the United States Constitution, respectfully

registers his Response to the Presentence Investigation Report (PSR) and

Memorandum in Aid of Sentencing and as grounds therefore, states as follows:

1

## I. __INTRODUCTION__

This case resulted in a jury trial and a guilty verdict as to each of the three counts charged in the Superseding Indictment.  This Court is well versed with the facts herein, and of the seriousness of the offenses charged by the Government. Jermayne Whyte is also very much aware of the serious nature of these criminal offenses.  His PSR affirms this, as the *advisory* guideline range is 324 to 405 months.  According to the latest federal sentencing statistics reported in the Sentencing Commission's "Sourcebook FYE 2016, Table 23, 98.3% of the 67,742 defendants sentenced last year faced a lesser *advisory* guideline range.

The PSR recommends a total offense level 36 and applies USSG § 2G1.3. Jermayne Whtye was convicted at trial and, hence, the PSR fails to apply any reduction for acceptance of responsibility.  However, Jermayne Whyte has always accepted responsibility.  He has admitted he was a pimp. All that Jermayne Whyte has ever contested in this case was his suspicion, let alone knowledge, that the victim in this case was under eighteen (18) years old. Indeed, Jermayne Whyte has always contested that in the few short weeks the victim was in his presence, any "reasonable opportunity to observe" the behavior

2

of the victim would never  lead him, or anyone, (including friends and family) to believe she was under eighteen (18) years old.  Without retrying the facts of this case, through this filing, Jermayne Whyte seeks an adjustment for acceptance of responsibility pursuant to the commentary of USSG § 3E1.1.  Whyte further objects to a 2- level enhancement pursuant to U.S.S.G. § 2G1.3(b)(2)(B).

We further submit this is not the typical USSG § 2G1.3 case before this Court because had the victim been known to the defendant for some time, had her actual age been clear, and had he actually introduced the victim to prostitution, Jermayne Whyte would still be facing the same offense level 36. This offense level hangs solely on a standard of "reasonable opportunity to observe".  Thus, we believe the applicable guideline in this case for a victim eighteen (18) years or older would be USSG § 2G1.1, and the base offense level would be 14, not 30.  For all these reasons, as well as additional § 3553 factors identified in this filing, this Court will be asked to impose a below guideline sentence which is both reasonable and not greater than necessary.

## II. OBJECTIONS TO THE PSR

1.  WHYTE objects to specific statements found in paragraphs 7, 9-13, 15, 16, 18, 20-26, all contained within the Offense Conduct section of the PSR. None of these statements are supported by either evidence or trial testimony and

it is the Government's burden of proof by a preponderance of the evidence standard.  Counsel will have further remarks at sentencing; however, Whyte specifically objects to the following:

Paragraph 7:

-The trial testimony established that the two advertisements which were shown to A.E. were not ones which were posted by the defendant's.  One advertisement was posted prior to meeting Whyte, and the other after A.E. had voluntarily left the residence.

Paragraph 9:

-There was no trial testimony that A.E told either defendant that she was 16 years old.  In fact, A.E. stated on cross examination that she did not remember telling the defendants her age and then laster stated that she never did.
-There was no trial testimony that either defendant was aware of A.E.'s true age.
-There was no trial testimony that A.E. was told by either defendant not to tell anyone her true age.
-There was no trial testimony that Whyte told A.E. to tell people that she was 20 years old.

Paragraph 10:

-There was no trial testimony that Whyte physically abused A.E.[1]
-There was no trial testimony that Whyte kept a loaf of bread in the freezer and hit A.E. with it.
-There was no trial testimony that Whyte pulled her hair or intentionally

---

[1] To the contrary, A.E. appears to have confided in both Whyte and Castro.  She openly discussed her alleged family problems, issues with her sisters (alcoholism and drug addiction), brothers incarceration and death, and caring for his children.  Whyte was very sympathetic and offered his assistance in an effort to help her overcome these issues.  Interestingly, according to the testimony of A.E., and her father, all these problems were a fabrication by A.E.

burnt her back with blunts.  A.E. testified that those burn marks were accidental.

-There was no trial testimony that Whyte forced A.E. to have sex with him.  A.E. testified that Whyte and her had consensual sex on the way to Atlanta (while still in Florida).

Paragraph 11:

-There was no evidence that A.E. was sexually exploited or forced to strip.

Paragraph 12:

-A red HTC phone was never found nor was there any trial testimony that it was the <u>primary</u> device that it was used to post A.E.  In fact, A.E testified that postings were made through her own phone, and were done by A.E. herself.

-There was no evidence, from the red HTC phone, of text messages between A.E., Whyte and Castro.

-There was no trial testimony that either Whyte or Castro kept A.E's prescriptions.

-There was no trial testimony that Whyte or Castro kept A.E's belongings locked up to prevent A.E. from running away.  In fact, A.E. was free to come and go as she pleased, testified that she did so, and returned to the residence on her own.

-A.E. testified that Castro took her to the doctor and paid the doctor's bill.

-A.E. testified that the medication was kept in the kitchen cabinet.

Paragraph 13:

-There was absolutely no trial testimony from any witness regarding this issue.  Whyte respectfully requests this paragraph be stricken.

Paragraph 15:

-Whyte respectfully requests this paragraph be stricken in its entirety.  The trial testimony was not consistent with what is alleged in this paragraph.  A.E. testified that none of these alleged injuries were the result of an intentional act by Whyte.

-Further, there was no testimony that A.E was provided information regarding email addresses created by Whyte so that he could communicate with clients, share pictures of A.E., and set up prostitution dates with A.E.

Paragraph 16:

-There was no evidence that Whyte or Castro provided A.E. with any Narcotics.

-Pursuant to A.E.'s testimony the only drug that A.E. was provided was Adderall, and she testified that it was only on one occasion and she had previously been prescribed this medication when she resided in California.

-There was no trial testimony that A.E. was provided MDMA or Ecstasy. However, there was testimony that A.E. ingested copious amounts of Marijuana, which she did on her own.  In fact, the court granted a defense special jury instruction as to A.E.'s perception while under the influence of marijuana.

-There was no trial testimony that Whyte engaged in sexual intercourse with A.E. in an effort to exploit and manipulate her into staying with him.

Paragraph 18:

-Agent Van Brunt testified that initially A.E. advised law enforcement that she initially met Castro while dancing at the playhouse.

**JAIL CALLS**:

Paragraphs 20-26 attempt to summarize jail calls during Whyte's incarceration.  Probation has failed to give context to any of the calls referenced in the PSR.  These calls need to be listened to in their entirety, as they were during trial.  However, Whyte will make the following objections in order to preserve the record:

6

Paragraph 20:

-The trial testimony established that after Whyte was incarcerated on an unrelated matter, A.E. was posted up by Castro with her consent, and A.E. posted herself as well, utilizing her own phone.


Paragraph 21-22:

-Both Castro and A.E. were working in concert. A.E. had every opportunity to leave and chose to stay. During this time, A.E. had her own phone, her own money, she was booking her own appointments, she assisted Castro with watching Castro's minor children, and she remained in constant contact with family and friends, through test messages, snapchat, Instagram, and Facebook.
-When listening to the calls from April 23, 2017, especially the one between Whyte and A.E., the call was nothing but cordial, friendly, and absolutely not threatening or coercive.  A.E. even states that "she misses Whyte driving her".

Paragraph 23:

-A review of the transcript does not reflect there was a discussion about A.E. using "Molly".  Additionally, there was no trial testimony as to this issue.

Paragraph 24-26:

-With respect to these calls it is important to note that A.E. was coming and going from the residence through on or about May 9, 2016 and left permanently by May 12, 2016.  A.E.'s testimony at trial reflected that she consistently contacted Castro about "working" and when she was going to post her up.  Further in other conversations between Whyte and A.E., Whyte never forces or coerces A.E. to work.  In fact, he tells A.E. that whenever she is ready she should call Castro and let her know she is ready to work.  Interestingly, during this time period, testimony at trial showed that A.E. was posting exclusively on her own, without the assistance of either defendant.

It is important to note that the majority of the information relied upon by probation was taken from FBI 302s and Broward Sheriff's Office police reports. A majority of this relied upon information was not supported by evidence or testimony at trial. In fact, it is curious as to why the government did not elicit any of this testimony from A.E. or the agents involved. Perhaps the government had an issue with the credibility of A.E.? Regardless, Probation is unaware, or has ignored, the following relevant conduct of A.E.:

-Neither Whyte nor Castro was responsible for bringing A.E. to South Florida.

-A.E. arrived in South Florida with identification which evidenced she was 19 years old.

-Prior to meeting the defendant's, A.E. was advertising and working on her own.

-A.E. continued to also advertise and work on her own during the time she resided at the residence as well as after she voluntarily left. This was substantiated through testimony at trial.

-A.E. consistently stated she had family in Florida, which included an Aunt and Stepbrother. This is untrue, as her father, Ronald Evans, testified A.E. had no family in the state. A.E. testified that her Aunt was actually the Madam from the first escort agency. When A.E. left the Whyte/Castro residence she went and lived with this women. This women drove her around and took her to meet her dates. She also lived with a guy named "Haitian Buddy".

-During a phone call with Whyte, A.E. cried as she told Whyte that her brother had died while incarcerated in California. She stated her brother had young children. She informed Whyte, during this call, that she told her grandmother "she is 20 years old".[2] Ronald Evans testified that A.E. does not

---

[2] One would think that Whyte, who the government alleged had knowledge of A.E.'s true age, would have stated something to the extent like, "How would you get your brother's kids if you are only 16; or doesn't your grandmother know your true age." (See ¶ 9 PSR).

have a brother.  This was untrue.

-In jail call #112 which occurred on May 18, 2016 (Defendants Exhibit # 23) A.E. tells Whyte.."And now like you feel me, like you guys don't know me, but like yeah you guys took care me.  You know what I'm saying."  This call is extremely important as it also evidences the interaction between A.E. and both Castro and Whyte's families; the fact that A.E. apparently told Whyte that her sister is an alcoholic and/or drug addict.  However, Ronald Evans said that although A.E. has a younger sister she is not an alcoholic or drug addict; Whyte told her he will assist her in getting her papers; A.E. discusses her brother and what he drinks but yet she does not have a brother; Whyte also expressed concern about A.E.'s safety.

2.  We object to paragraph 37 of the PSR and the 2-level enhancement for "unduly influencing a minor to engage in prohibited sexual conduct," USSG § 2G1.3 (b) (2)(B).  Pursuant to comment (n. 3(B)) of that section, "in a case in which a participant is at least 10 years older than the minor, there shall be a rebuttable presumption that subsection (b)(2)(B) applies.  In such a case, some degree of undue influence can be presumed because of the substantial difference in age between the participant and the minor." Notwithstanding, this same commentary also states that "in determining whether subsection (b)(2)(B) applies,   the court should closely consider the facts of the case to determine whether the participant's influence over the minor compromised the voluntariness of the minor's behavior.  With that said, we contend the defendant never unduly influenced A.E. to engage in prostitution because she was actively engaged in prostitution before she met him.  Therefore, this enhancement does

9

not apply when the following facts are considered:

• On or about June 15, 2015, A.E. pled guilty in Yuba County, California to two separate criminal cases charging her with Intimidation of Witnesses and Victims with a gang enhancement and Assault with Deadly Weapon or Force Likely to Produce Great Bodily Harm, also with a gang enhancement.  A.E. had admitted she was affiliated with the "Crips" and "Nortenos" gangs.  She was sentenced to five years probation in those cases.

• On or about June 22, 2015, a violation of probation warrant was issued for A.E.  for failing to register as a gang member and a new arrest for petty theft.  A.E. was soon arrested on the warrant and remained incarcerated until January 4, 2016, when her probation was reinstated.

• On or about February 4, 2016, A.E. admitted to her father she had stolen his AR-15 and .357 magnum.  A.E. disappeared that day and her father reported this to both the Sacramento Police Department and her probation officer.

• Again, in February 2016, A.E. obtained a fraudulent California driver's license under the name A__. T___, with a date of birth of x/xx/1997.  She remained a fugitive, obtained an airline ticket to fly from Los Angeles to Miami, and was picked up in Miami. A.E. testified that the aforementioned driver's license was provided to her by an individual known as Marcus Weber (a.k.a. Uzzy Marcus).  She stated this person, threatened her, stole her father's guns, took her to Los Angeles, put her up in a hotel, paid for a plane ticket, and sent her to Miami.  She further testified that she did not personally know Weber or Thomas.  However, both of these people are friends with her on Facebook.[3]  Also, she had a conversation with Thomas, via snapchat, (defendant's exhibit 2 pgs. 60, 61, 182) subsequent to the guns being reported missing and prior to leaving for Miami.  She also admitted to conducting an internet search for "Uzzy Marcus" while in Florida in April, 2016.

• Upon arriving in Miami, A.E. paid $675.00 for professional modeling photographs and immediately began posting her "services" on web pages, including backpage and craigslist.  A.E. also posted one of these photographs on her Instagram account.  An account which she admitted had approximately seven hundred (700) followers.

---

[3] Shortly after A.E.'s testimony, and presumably her return to California, this facebook page was subsequently deleted.

• In February and early March 2016, A.E. emailed NJFantasygirls@ymail.com, bookingcompanions@gmail.com, www.prettywomenemail@aol.com and other sites, advertising her "services" and describing herself as 18 years old of various ethnic backgrounds. Her March 5, 2016 post to craigslist stated "Hi, I just move to Miami. I am a model but I am looking for something serious to spend time with and be comfortable with. I would like to make someone happy and I am very sweet. Maybe you can call me 786-xxx-xxxx. These are some of my recent pictures from a photoshoot."

In *U.S. v. Myers*, 481 F. 3d 1107, (8th Cir. 2007), the appeals court refused to apply this enhancement because the girl had already possessed some inclination to leave home before she encountered the defendant and had contemplated running away with another man.

The facts of this case clearly indicate Jermayne Whyte never unduly influenced A.E. to engage in prohibited sexual conduct because all of the above occurred **BEFORE** they had met. These same facts also rebut any presumption the enhancement applies and, therefore, paragraph 37 of the PSR should be deleted.

3. We object to **paragraphs 33 and 45** of the PSR and the failure to apply a 2-level reduction for acceptance of responsibility. Notwithstanding the jury's verdict in this case, § 3E1.1, comment. (n.2), states in part:

> In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his

11

constitutional right to a trial.  **This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).**  In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pretrial statements and conduct.

Under § 3E1.1, comment. (n.2), conviction by trial "does not automatically preclude a defendant from consideration for such a reduction." *U.S. v. Cantrell*, 433 F. 3d 1269 (9th Cir. 2006) (stating that a contrite defendant who goes to trial may nonetheless be eligible for the acceptance reduction); *U.S. v. Cortes*, 299 F. 3d 1030 (9th Cir. 2002), (remanded to determine whether defendant simply put the government to a proof at trial to preserve his constitutional claim that the carjacking statute violated the Commerce Clause).

In this case, Jermayne Whyte has admitted he was a pimp.  This was admitted by defense counsel during closing argument.  Further, Whyte never denied the fact that he facilitated advertising A.E. on backpage.  However, A.E. had previously advertised on backpage, and other sites as well; stated she worked in adult establishments; and posted these advertisements with A.E's consent.  The issue has always been that Whyte believed A.E. was over the age of eighteen (18) years.

There were several plea negotiations between the parties. However, the sole reason this case proceeded to trial, and did not result in a change of plea, was because Jermayne Whyte has contended he did not know the victim was under eighteen (18) years old. Additionally, there was nothing to indicate to him she was under eighteen (18), even after the few short weeks he was physically able to be with her. For these reasons, we believe a 2-level reduction for acceptance of responsibility should apply.  Counsel will have further remarks regarding this issue at sentencing.

4.  Whyte objects to paragraph 39 of the PSR which increases the base offense by (2) two levels because the offense involved the commission of a sex act or sexual contact pursuant to U.S.S.G. § 2G1.3(b)(4)(A). This (2) two level increase is "double counting" in that the Base Offense Level for a conviction for 18 U.S.C. § 1591(b)(2) contemplates and already takes into consideration the commission of a sex act or sexual contact with a minor. Improper double counting occurs when "precisely the same aspect" of the defendant's conduct is "factor[ed] into his sentence in two separate ways." *United States v. Farrow,* 198 F.3d 179, 193 (6th Cir.1999).

In this case, USSG § 2G1.3(a)(2) applies because Whyte was convicted of 18 U.S.C. § 1591(b)(2). This criminal offense requires that a defendant "cause a

13

minor to engage in a **commercial sex act.**" and if so, raises the base level to 30. U.S.S.G. Alternatively, § 2G1.3(b)(4)(A) seeks to also increase a defendant's punishment on account of the same kind of harm that has already been fully accounted for, i.e. **sex act or sexual contact**, by application of 18 U.S.C. § 1591 and U.S.S.G. § 2G1.3(a)(2).

5.  Based on the above objection, we believe the total offense level is 30 and with a criminal history category VI, the *advisory* guideline range is 168 to 210 months.

### III.   <u>SENTENCING MEMORANDUM</u>

Jermayne Whyte has been found guilty of serious crimes.  Punishment is required to address these crimes.  However, even if this Court imposes the ten year mandatory minimum sentence in this case, his conviction will result in the stain of a federal felony conviction for a sex-related crime. "Extensive restrictions affecting where he can live and work, and how he will be controlled, will follow him for many years." *United States v. D.M.*, 924 F.Supp.2d 327 (2nd Cir. 2013).

This Court is aware of the facts of this case, objections have been made to the guideline calculations presented in the PSR, and a notice of appeal will be filed on his behalf. Notwithstanding, as to sentencing, this Court is aware the

14

United States Supreme Court has rejected the mandatory nature of the Sentencing Guidelines.  As made clear in *U.S. v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005)[4], district courts are only required to give "some weight" to the advisory guidelines, and are to consider the 18 USC § 3553 factors.  As set forth in *Nelson v. U.S.*, 555 U.S. 350, 129 S. Ct. 890 (2009), *Rita v. U.S.*, 551 U.S. 338, 127 S. Ct. 2456 (2007) and *Booker supra*, a sentencing court may not presume that a sentence within the applicable guideline range is reasonable but added, "[t]he Guidelines are not only not mandatory on sentencing courts, they are not to be presumed reasonable.*"  Nelson v. U.S.*, 555 U.S. at 352, 125 S. Ct. at 892. (emphasis added).

Pursuant to USSG § 5K2.0(a)(4)(b)(2), in child crimes and sexual offenses, under 18 USC § 3553(b)(2)(A)(ii), the sentencing court may impose a sentence below the range established by the applicable guideline range only if the court finds there exists a mitigating circumstance of a kind, or to a degree, that has not been taken in consideration by the Sentencing Commission in formulating the guidelines.  We believe such circumstances exist in this case. Further, it is not  unusual that courts have imposed sentences below the *advisory*

---

[4] See also *Gall v. U.S.*, 552 U.S. 38, 128 S. Ct. 586, (2007), *Kimbrough v. U.S.*, 552 U.S. 85, 128 S. Ct. 558, (2007), and *U.S. v. McBride*, 511 F. 3d 1293 (11th Cir. 2007).

guideline range in cases similar to this.  Indeed, the latest federal sentencing statistics presented in the  Sentencing Commission's "Sourcebook," FYE 2016, Table 31C: Below Guideline Range with *Booker*/18 USC § 3553: Degree of Decrease for Offenders in Each Primary Offense Category for Fiscal Year 2016, found 97 sexual abuse cases reported to the Commission. The median sentence was 96 months; the median decrease from the guideline minimum was 31 months, and the median percent decrease from guideline minimum was 30.1%.

Table 28 of the "Sourcebook" provides additional sentencing information specific to 418 cases in which § 2G1.3 was applied.  Only 172 of those cases were sentenced within the *advisory* guideline range; 22 were sentenced above the range and the remainder below the range for either government sponsored motions, downward departures or downward variances.

Finally, November 1, 2017 marks 30 years since federal sentencing guidelines became law.  And in each Sentencing  Guidelines Manual in affect during those  past 30 years,  Chapter One, Part A: Introduction and Authority, the Basic Approach to the Sentencing Guidelines has remained largely unchanged.   "To understand the guidelines and their underlying rational, it is important to focus on the three objectives that Congress sought to achieve in enacting the Sentencing Reform Act of 1984."  Those three objectives are to

16

insure honesty, uniformity and proportionality in sentencing.  It remains truer in the post-*Booker* era.   With all that said, we believe a below-guidelines sentence is reasonable and, in support, we offer the following.

### A.  Nature and Circumstances of the Offense

Without attempting to retry the facts of this case, the following is relevant under 18 USC § 3553 in fashioning a reasonable but not greater than necessary sentence.   As previously stated, this is not the typical case in which § 2G1.3 of the sentencing guidelines is applied.  This is not a case in which the victim's age was readily known or obvious to the defendant, it is not a case in which the defendant trained and introduced the victim to prostitution, and it is not a case in which the relationship between the victim and the defendant lasted very long.  In this case, it lasted weeks, not months or years.

• By February 2016, the victim had traveled from California to South Florida with a fraudulent driver's license with a date of birth of xx/xx/1997, after absconding from probation supervision.  Once she arrived in South Florida, she paid for professional modeling photographs, began employment as an escort, and advertised her "availability" on various websites, describing herself and stating she was at least 18 years old.[5]

• About March 30, 2016, the victim, while working at the Playhouse Gentlemen's Club, befriended another female co-worker, Jennifer Castro.  The victim confided she had no place to live and Castro invited her to stay with her

---

[5] See Defendant's Motion to Dismiss Indictment (D.E.# 31 ).

and her boyfriend, Jermayne Whyte.[6]   This arrangement began on April 1, 2016.

• At all times, the victim represented to Castro and Whyte she was 20 years old.  What the defendants "observed" was that the victim was already working at a strip club, she was working as an "escort," and she had posted her services on Backpage.com. She had tattoos (you must be 18 pursuant to Cal. Penal Code § 653), and she was able to purchase both alcohol and cigarettes.

• On April 23, 2016, Jermayne Whyte was arrested and held without bond for violation of probation.  The victim remained at the residence for another two weeks and continued to work with Castro as well as on her own, as a prostitute. Furthermore, A.E. acted as Castro's pimp and arranged a date with "Haitian Buddy's" friend.

•  On May 11, 2016, at 8:52 AM, the victim had a phone conversation with Jermayne Whyte, who was still incarcerated.  The victim told him of a conversation she had just had with her grandmother and she reminded her grandmother she (victim) was 20 years old. (Defendants Exhibit #15)  The government did not admit any evidence concerning conversations between A.E. and either defendant which would indicated that they knew or were told A.E was under the age of eighteen (18).[7]

• Jermayne Whyte was with the victim for only a few short weeks in April 2016.  At no time did the victim ever represent to the defendant her true age.  In

---

[6] Paragraph 18 of the PSR states that on January 3, 2017, A.E. advised that she met the defendant's when they contacted her pursuant to an escort agency advertisement.  A.E.'s originally stated that she met Castro at the Playhouse while working and ultimately befriended her.  In trial Agent Van Brunt agreed that these statements were made.  He also agreed that neither A.E. nor Castro would have had an opportunity to discuss these statements since A.E. was arrested on May 28, 2016 and never saw either defendant again.

[7] Interestingly, during a sidebar conference the court stated, "We need to address the elephant in the room."  Meaning up until that point in the trial there was no evidence that either defendant was informed of A.E.'s age.  The government replied stating that they do not intend to elicit such evidence because the statute is strict liability and they are proceeding under the "reasonable opportunity to observe theory".

18

fact, all indications were she was at least 18 years of age.  There was no reason to doubt her.  No one else did.

     • There was never a need to persuade, induce, entice, or coerce the victim in this case to engage in prostitution. The victim had been working at a strip club, she was working as an escort, she had photographs taken of herself, and she had posted herself on Backpage offering herself as a prostitute.  This occurred before she had ever met the defendants in this case.  Additionally, the evidence at trial clearly showed that A.E. had advertised exclusively on her own during her time with the defendant's as well as when she left the residence which was on or about May 9, 2016.

This is a case in which there clearly exists mitigating circumstances of a kind or to a degree not contemplated by the Sentencing Commission when creating § 2G1.3.   The standard of proof as to the victim's age, as well as the harm to the victim, are not typical in cases in which § 5G1.3 have been applied.[8] Again, had the victim in this case not been found to be a minor by a "reasonable opportunity to observe" standard, we believe the applicable guideline would be §

---

[8] In *U.S. v. Dontavious Blake* and Tara Jo Moore, WL 3586887 (11th Cir.  August 1st, 2017), in which the same "reasonable opportunity to observe" standard was employed, evidence was the defendant spent 20 minutes photographing the victim, had an adult prostitute spend time with the victim because her manner of talking and approaching things made her seem younger than she claimed to be, defendant had to purchase cigarettes for the victim and it was the defendant who posted the victim on Backpage.com.

    In *U.S. v. Mozie*, 752 F. 3d 1271 (11th Cir.  2014), there was sufficient evidence the defendant recruited victims to work in his brothel, he knew the victims, ages 13, 16 and 17, were minors because they wrote down their true birth dates and the defendant told one victim to "tell the guys that [she] was 18 because if [she] didn't, they wouldn't want to have sex with [her] because [she] was a minor."  18 USC § 1591.

5G1.1 and the base offense level would be 14, not 30.  Counsel will have further remarks at the time of sentencing.

### B.  The Need to Avoid Disparity in Sentencing Similarly Charged Defendants, 18 USC § 3553(a)(6)

Notwithstanding the ten year mandatory minimum that applies in this case, this Court is asked to consider two very recent cases in State courts in California and New Jersey. First, is 20 year old Talia Vasquez who was sentenced June 30, 2017 in Visalia, California. Vasquez pled no contest to a felony count of human trafficking of a minor for a sex act on May 30, 2017.  Her co-defendant, Lewis Shaw, pled no contest as an accessory and his sentencing is pending.

The minor in this case was a runaway who believed Vasquez was her friend.  Vasquez told her she had a good job providing messages to men in a motel room and she would let her work with her.  Police found both of them in the motel room and evidence in the room showed the two defendants intended to have the girl have sex with others for money.  Vasquez was sentenced to five years state prison.

A second recent case occurred on September 14, 2017, when a New Jersey woman, 29 year old Jessica Copeland, pled guilty to second degree

20

human trafficking.  Under the plea agreement, she is to be sentenced to six years
state prison, including no parole for three years.

According to New Jersey Attorney General Christopher S. Porrino, "this
defendant threatened a 16 year old girl with violence to keep her trapped in a
hellish life of sexual slavery.  This is a classic case of human trafficking in
which the perpetrators isolated and intimidated a vulnerable victim so they could
exploit her for their profit."  Prosecutors said Copland acted as a boss or
"bottom" over the prostitutes in a ring that operated in Jersey motels and
advertised on Backpage.

In other federal cases where the victim's age was readily apparent are:

In *U.S. v. Lacy,* 2017 WL 1880971 (Kansas D.C. May 9, 2017) Victim
testified she was 16 when doing calls for Lacy, although she testified that she
told Lacy she was 17.  However, Lacy found out her real age in facebook
messages which were sent between the victim and Lacy.

In *U.S. v. Rico*, 619 Fed.Appx 595 9th Cir. 2015), The evidence that Rico
knew, had a reasonable opportunity to observe, and recklessly disregarded the
victim's age was powerful.

In *U.S. v. Robinson*, 702 F.2d 22 (2nd Cir. 2012), Court made a finding
that victim was coerced as a minor to prostitute herself by defendant.

In *U.S. v. Lockhart*, 844 F.3d 501 (5th Cir. 2016), Victims testimony demonstrated that Appellants knew, or at least recklessly disregarded the fact that, their victims had not attained the age of 18.

In *U.S. v Corley*, 2017 WL 549021 (2nd Cir. 2017), The government offered ample evidence that Corley had actual knowledge of the age of the victims and the special verdict showed the government had proven his actual knowledge.

In *U.S. v. Duong*, 848 F. 3d.928 (10th Cir. 2017) defendant pled to a violation of 18 USC 1594 (c ).  He was sentenced to twenty-four months BOP followed by five years of supervised release.

In the case *sub judice*, other than arguable testimony referencing A.E.'s immaturity, at times, there was no evidence adduced at trial by the government which would substantiate that Whyte was aware of A.E.'s age.  Yet, Jermayne Whyte faces a mandatory minimum 10 year sentence and an advisory guideline range of at least 324 to 405 months.

Defendant's Criminal History category VI over-represents the seriousness of his prior criminal conduct:  Pursuant to § 4A1.3(b), "if reliable information indicates the defendant's criminal history category substantially over-represents

the seriousness of the defendant's criminal history *or* the likelihood that the

defendant will commit future crimes, a downward departure may be warranted.

There are no prohibitions or limitations to the extent of any departure

affecting this defendant, USSG § 4A1.3 (b)(2) and (3); however, this Court is

asked to consider the following as sentencing factors under 18 USC § 3553 in

determining a reasonable and not greater than necessary sentence in this case.

• According to paragraph 62 of the PSR, the defendant has 13 criminal

history points and criminal history category VI applies.  According to the

Sentencing table, Criminal History Category VI begins with 13 points.  Criminal

History Category VI would apply to a defendant with 15, 18, or even 25 criminal

history points.  Criminal History Category VI would also apply to a violent

offender or a career offender. This defendant has no prior convictions for

violence or firearms.

• The defendant received one criminal history point for "a small amount

of marijuana" (see PSR, paragraph 53), one criminal history point after

adjudication was withheld after he "was issued a municipal ordinance citation"

for possession of marijuana (see PSR, paragraph 55, one criminal history point

for "three MDMA tablets" (see PSR, paragraph 56), and two criminal history

points for false ID given to LEO and driving with a suspended license, both

23

misdemeanors, (see PSR, paragraph 58).  But for those five criminal history points, the defendant would have been in the middle of criminal history category IV.

    • Although the defendant's criminal history is presented in paragraphs 47 through 68 of the PSR and appears extensive, a closer look reveals his Juvenile Adjudications were for conduct between the ages of 14 and 17, his Adult Convictions, except for a single traffic misdemeanor, all occurred between the ages of 19 and 22, and his Other Criminal Conduct (non-convictions) all occurred before he turned 22 years old.  Jermayne Whyte is now 29 years old.

    Had Jermayne Whyte's criminal history included convictions for major drug trafficking or crimes of violence, or had he been found to be a career offender, or even an armed career criminal, he would still be criminal history category VI.  This Court is asked to consider this factor in fashioning a reasonable and not greater than necessary sentence in this case.

## C. <u>Personal and Family History</u>

    Jermayne Whyte is a 29 year old native of Queens, New York, who came to South Florida with his mother when he was 13 years old.  He is the only child of Karen Whyte, and he knows nothing about his biological father, including his name.  He has been in a relationship with co-defendant Jennifer Castro since

2013 and, together, they have a two year old son.  Before the arrest, he was also helping Jennifer care for her seven year old daughter.

Jermayne Whyte's formative years began in a household which included his mother, his grandmother, two aunts and two uncles in a working-class neighborhood that experienced both high crime and organized gang activity.  His mother often held more than one job and attended college for years while he was cared for primarily by his grandmother.  He attended public schools and reported no abuse during those years.

At 13, Jermayne moved to South Florida with all the members of the Queens household.  He and his mother first lived in a two bedroom apartment in Plantation with his aunt and Jermayne slept on the sofa.  A year or two later, his mother and grandmother bought the house at 4530 NW 90th Avenue in Sunrise, and it was there he spent his remaining formative years.

At 16, Jermayne began smoking marijuana.  He left school, left his mother's house, and has admitted he was addicted to the streets.  He often stayed with friends and he spent time with his cousin in New York.  He smoked marijuana every day, all day.

He married Lee Shatzel, a middle school classmate, in 2008 when he was 19 or 20 years old.  He worked at the Ross clothing store and she worked at her

father's stall at the Swap Shop.  He has admitted the marriage soon failed because he continued to smoke marijuana and get into trouble.  He remained in DOC custody from 2009 to 2013.

He began living with co-defendant Jennifer Castro in 2013.  They lived in an Oakland Park apartment with her daughter from a previous relationship and, during that time, Jermayne worked for a towing company and Jennifer worked at a strip club and tag agency.  Jeremiah was born in 2015.  Jermayne admitted he continued to smoke marijuana until he was arrested for violation of probation on April 23, 2016.  He was arrested on the instant federal charges the day he was released from state custody on December 21, 2016.  He has now been in continuous custody for more than a year.

### D. **Jermayne Whyte's  Extraordinary Family Ties and Responsibilities**

Jermayne Whyte and Jennifer Castro have lived together since 2013.  Together, they have a two year old son and Jennifer also has a seven year old daughter son from a previous relationship which Jermayne help raise.  Since their incarceration, the two children have been cared for by grandparents.  The prospect of the children seeing both parents together any time soon is not good.

Both parents face 10 year mandatory minimum sentences and an *advisory* guideline range which far exceeds that.

Effective October 27, 2003, the Sentencing Commission amended § 5H1.6 to limit the availability of departures for family ties and responsibilities. The new application note, § 5H1.6, comment. n.1 (A)(i)-(iii),  instructs the court to consider the seriousness of the offense, the defendant's involvement in that offense, and the members of the defendant's family.  Further, comment. (n.1(B)(i)-(iv) requires the court to consider if  "the defendant's service of a sentence within the guideline range will cause a substantial loss of essential care-taking or essential financial support to his family,"  that "the loss of care-taking or financial support exceeds the harm ordinarily incident to incarceration for a similarly situated defendant," that "the loss of care-taking or financial support is one in which no effective remedial or ameliorative programs reasonably are available,"  and that "the departure will effectively address the loss of care-taking or financial support."  Notwithstanding this pre *Booker* amendment, Jermayne Whyte asks this Court to consider his family ties and responsibilities in fashioning a reasonable and not greater than necessary sentence in his case.

The  prospect  of  incarcerating  two  young  parents  of  two  very  young

children at the same time is not something courts see every day.  However, courts have addressed the issue of incarcerating the sole parent of very young children and much has been written on the subject.

• "Children with fathers who have been incarcerated are significantly more likely than other children to be expelled or suspended from school (23 % compared with 4%). Pew Charitable Trusts Report "Collateral Costs: Incarceration's Effect on Economic Mobility" (2010) at page 5.  "Incarceration also creates economic aftershocks for these children and their families disrupted, destabilized, and deprived of a wage-earner, families with an incarcerated parent are likely to experience a decline in household income as well as an increased likely of poverty.  The struggle to maintain ties with a family member confined in an often-distant prison creates additional financial hardship for already fragile families left behind."  Id. At page 18.

• "Parental incarceration contributes to higher rates of delinquency, mental illness, and drug abuse, and reduces level of school success and later employment among their children."  Unlocking America, Why and How to Reduce America's Prison Population (JFA Institute, November 2007) at page 32.

Several Courts have responded as follows:

28

• *U.S. v. Hammond*, 37 F.Supp. 2d 204 (E.D.N.Y. 1999), "a sentence without a downward departure would contribute to the needless suffering of young, innocent children."

• *U.S. v. DeRoover*, 36 F.Supp. 2d 531, 532-33 (E.D.N.Y. 1999), "the unique dependence of children on a defendant is a basis for a downward departure."

• *U.S. v. Chambers*, 885 F.Supp. 12, 14 (D.D.C. 1995), "causing needless suffering of young, innocent children does not promote the ends of justice."

• *U.S. v. Johnson*, 964 F.2d 124, 128-130 (2d Cir. 1992), "we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."

Again, Jermayne Whyte and Jennifer Castro have two children, 2 and 7, and both parents face at least a ten year mandatory minimum sentence. Grandparents will have to raise the children in the years to come, while their parents will be incarcerated at separate BOP facilities. With that said, this Court is asked to consider a reasonable but not greater than necessary sentence in this case.

## E. Bureau of Prisons Designation and Visiting Issues Unique to Jermayne Whyte and This Offense

The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the moral of the inmate and to develop closer relationships between the inmate and family members or others in the community" (see BOP p.s. 5267.07). However, defendants who violate federal

sex offense statutes are barred from designation to a minimum security camp, they are prohibited access to a computer and the Bureau of Prisons' Corrlinks email system, they are barred from early release through RDAP, they are not eligible for early release to a community confinement center, and they have difficulty finding any place to live as a registered sex offender.  Pursuant to 18 USC § 3624(c)(1), generally, inmates serving a term of incarceration are to spend a portion of the final months (not to exceed 12 months), under conditions that will afford them a reasonable opportunity to adjust to and prepare for reentry of that prisoner into the community.  Again, this offense bars Jermayne Whyte   from this provision and the result is that any sentence imposed by this Court will have him serve up to 12 months more jail time than most other inmates similarly sentenced.

### F. Latest Sentencing Statistics

The United States Sentencing Commission's "Sourcebook" of Federal Sentencing Statistics for fiscal year 2016 provides statistics for 67,742 cases sentenced that year.  Specifically, as to 2,174  cases sentenced in the Southern District of Florida last year, 38.8 % received sentences below the *advisory* guideline range; 6.5 % because of substantial assistance motions, and 26.7 %, more than four times the number of Government sponsored motions, because of

the sentencing factors of 18 USC § 3553. Nationally, the nature and circumstances of the offense and/or history and characteristics of the defendant were cited as reasons for a downward variance in 10,324 cases. Indeed, district courts continue to exercise discretion, post-*Booker*, and impose sentences below the *advisory* guideline range.

## CONCLUSION

Based upon the facts and factors set forth above, Jermayne Whyte respectfully requests this Court: 1) sustain our request for a 2-level adjustment for acceptance of responsibility; (2)  impose a sentence below the *advisory* guideline range after considering all the 18 USC § 3553 factors identified in this filing;  and (3) recommend  the BOP consider designating him to  a  facility as close to his mother and children in South Florida as is possible.

Jermayne Whyte and Counsel thank this Court for considering our Response to the PSR and Memorandum in Aid of Sentencing.  Counsel will have further remarks at the time of sentencing.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished via CM/ECF to the following: Assistant U.S. Attorney, Francis

31

Viamontes, located at 500 E. Broward Blvd. Suite 700, Ft. Lauderdale, Florida

33394 this 18th day of October, 2017.

         /s/ Russell J. Williams
         **RUSSELL J. WILLIAMS, ESQ.**
         Williams, Hilal, Wigand, Grande
         PLLC Attorney for Defendant
         Trial Lawyers Building
         633 Southeast 3rd Avenue, Suite
         301 Fort Lauderdale, FL 33301
         Office: (954) 525-2889
         Fax: (954) 764-7272
         Florida Bar # 727751
         Email: Rjwesquire@aol.com